**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

MEIKO BUCHANAN,

      **Plaintiff,**

v.                                                                          Case No. 3:23-CV-512-NJR

STEVEN BOWMAN, DR. PERCY
MYERS, ALISA DEARMOND, JILIAN
CRANE, and ANTHONY WILLS,

      **Defendants.**

## MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

Plaintiff Meiko Buchanan, an inmate of the Illinois Department of Corrections ("IDOC") who is currently incarcerated at Menard Correctional Center ("Menard"), filed this action pursuant to 42 U.S.C. § 1983 for alleged deprivations of his Eighth Amendment rights while housed at both Pinckneyville Correctional Center ("Pinckneyville") and Menard. Specifically, Buchanan claims that Defendants were deliberately indifferent to his serious medical needs when they failed to properly treat his left ear pain, delayed treatment, and failed to refer him to an outside provider to address his ear pain and hearing loss.

Now pending before the Court are Motions for Summary Judgment filed by three medical providers employed by Wexford Health Sources, Inc.: Defendants Jilian Crane, NP (Doc. 102), Alisa Dearmond, NP (Doc. 105), and Percy Myers, M.D. (Doc. 108) (collectively, "the Wexford Defendants"). Also pending is a Motion for Summary

Judgment filed by IDOC employees Steven Bowman and Anthony Wills (collectively, "the IDOC Defendants") (Doc. 117). The Court appointed counsel for Buchanan, and counsel filed timely responses to Defendants' motions. (Docs. 133, 135, 137, 139). Each Defendant also filed a reply brief. (Docs. 140, 141, 142, 145). For the reasons set forth below, Defendants' motions are granted.

## BACKGROUND

### I.    Local Rule 56.1 and Federal Rules of Evidence

The Court first addresses general evidentiary issues raised by the parties' summary judgment briefing. Both parties object to the Statement of Material Facts filed by the opposing party on various grounds.

Buchanan objects to the undisputed material facts stated by NP Crane, NP Dearmond, and Dr. Myers because the facts are not within the witnesses' personal knowledge, Defendants have not been disclosed as expert witnesses, and no foundation has been laid for their testimony. Buchanan also objects to certain "facts" that are actually legal argument disguised as expert witness opinion. Finally, Buchanan argues that the factual statements are compound and not in separately numbered paragraphs as required by Local Rule 56.1.

In their replies, the Wexford Defendants provided the Court with their Rule 26(a)(2)(C) expert disclosures, which include NP Crane, NP Dearmond, and Dr. Myers, and comprehensively detail the subject matter of their expected testimony. (Doc. 141-1). The disclosures were mailed to Buchanan on April 1, 2025, and supplemental disclosures were mailed on April 30, 2025. (*Id.*). The Court appointed counsel for Buchanan on

August 13, 2025, so the Court presumes that counsel was unaware of Defendants' disclosures. Because the Wexford Defendants were disclosed as experts under Rule 26(a)(2)(c), the Court overrules Buchanan's objections to their opinions. However, the Court will not consider any portion of a factual statement that contains improper legal arguments or conclusions. *See Patterson v. Ind. Newspapers, Inc.*, 589 F.3d 357, 359–60 (7th Cir. 2009) (affirming decision to disregard "argumentative" facts submitted in support of summary judgment).

The Court also notes that the Wexford Defendants disregarded Local Rule 56.1 when they lumped numerous statements of fact into one numbered paragraph. Each material fact should be set forth in its own, separately numbered paragraph so that opposing parties can easily admit or deny the facts with appropriate citations to the record. SDIL-LR 56.1(a). Notwithstanding this violation, the Court notes that Buchanan was able to respond to the statements. Accordingly, the Court will not impose sanctions in this instance. *See Cichon v. Exelon Generation Co.*, 401 F.3d 803, 809–10 (7th Cir. 2005) (a district court has discretion to impose a penalty when a litigant does not comply with the court's local rules regarding summary judgment).

For their part, the Wexford Defendants object to any facts that rely on Buchanan's grievances or sick call slips, asserting that the documents consist of inadmissible hearsay under the Federal Rules of Evidence.

While prison grievances are hearsay when considered for the truth of their contents, the Seventh Circuit has recognized that summary judgment evidence "does not need to be admissible in form; it only needs to be admissible in content." *Wheatley v.*

*Factory Card & Party Outlet*, 826 F.3d 412, 420 (7th Cir. 2016). Because the statements within a prisoner's grievances are within his personal knowledge, and he can testify about them at trial, some district courts consider them on summary judgment. *See, e.g.*, *Matthews v. Illinois Dep't of Corr.*, No. 16-CV-11214, 2024 WL 867087, at *2 (N.D. Ill. Feb. 29, 2024); *Salley v. Parker*, No. 18-CV-5700, 2022 WL 2952818, at *9 (N.D. Ill. July 26, 2022).

Here, the statements within Buchanan's grievances are within his personal knowledge and he could testify to their contents at trial. Moreover, the grievances could be admissible for a purpose other than the truth of the matter asserted, including to demonstrate that Defendants had notice of his complaints. Therefore, the Court will not disregard them for purposes of summary judgment, and Defendants' objection is overruled. As to Buchanan's sick call slips, the statements within them were made to request medical treatment and describe his symptoms, *see* FED. R. EVID. 803(4), and Buchanan can testify as to his personal knowledge of their contents at trial. Therefore, Defendants' objection is again overruled.

## II.    Procedural History

On February 16, 2023, Buchanan filed his Complaint alleging deliberate indifference with regard to treatment of pain in his left ear. (Doc. 1). Along with his Complaint, Buchanan filed a Motion for Preliminary Injunction. (Doc. 4). After the Court conducted a review of the Complaint pursuant to 28 U.S.C. § 1915A, Buchanan was allowed to proceed on the following claims:

> **Count 1:**    Eighth Amendment deliberate indifference claim against Dr. Myers for failing to properly treat Buchanan's ear pain and allowing him to be transferred to Menard without treatment.

**Count 2:** Eighth Amendment deliberate indifference claim against NP Dearmond and NP Crane for refusing to refer Buchanan for outside care of his left ear pain and hearing loss despite Menard lacking an onsite treating physician.

**Count 3:** Eighth Amendment deliberate indifference claim against Bowman (individual capacity only) for failing to hire an onsite medical doctor at Menard, delaying medical treatment through the collegial review process, failing to adequately hire and train staff, and failing to keep medical records requests.

(Doc. 8). To the extent Buchanan sought injunctive relief in the form of an outside referral to a specialist, the Court added Warden Anthony Wills (in his official capacity only) for the purpose of implementing any injunctive relief awarded. (*Id.* at p. 5).

On June 28, 2023, after holding a hearing on the matter, the Court denied Buchanan's Motion for Preliminary Injunction. (Docs. 61, 62).

## III.   Undisputed Material Facts

### A.   The Wexford Defendants

On January 18, 2022, Buchanan wrote a grievance to prison officials at Pinckneyville complaining that he had a bug infestation in his cell and requesting that his cell be sprayed immediately. (Doc. 133-2 at p. 1). Three days later, on January 21, 2022, Buchanan submitted a sick call slip to see health care because he woke up with hearing loss, pain, and a feeling like there was something in his ear that he could not get out. (*Id.* at p. 2). Buchanan saw a nurse the next day who noted that his tympanic membrane (eardrum) was red. (*Id.* at p. 3). The nurse instructed Buchanan not to put anything in his ear, prescribed Tylenol for discomfort, prescribed Debrox drops for earwax, referred him to the clinic for follow-up after five days for ear flushing with warm water, and told him

to return to sick call if his symptoms worsened or persisted. (*Id.*).

On January 24, 2022, Buchanan wrote another sick call slip complaining that it still felt like something was in his ear and that the Debrox drops and Tylenol were not working. (*Id.* at p. 4). The next day, January 25, 2022, Buchanan again filled out a sick call slip stating that he could not hear out of his left ear and the pain medication and ear drops were not working. (*Id.* at p. 5). On January 26, 2022, a nurse wrote a note stating that Buchanan was not seen at nurse sick call because he was in a group meeting. (*Id.* at p. 4).

Dr. Myers examined Buchanan on January 28, 2022. (*Id.* at p. 6). Dr. Myers was the Medical Director at Pinckneyville from June 13, 2018, to September 21, 2024. (Doc. 110-1 at ¶ 1). Buchanan complained to Dr. Myers of left ear problems, saying it felt like there was something in his ear. (Doc. 133-2 at p. 6). Upon probing his ear, Dr. Myers found no pertinent clinical findings to report, indicating a normal left ear canal. (Doc. 110-1 at ¶ 14). However, due to Buchanan's complaints, length of symptoms, and lack of clear objective clinical findings, Dr. Myers diagnosed Buchanan with mild otitis in his left ear and prescribed Maxitrol drops, three times per day for seven days, and Tylenol 325 mg as needed up to three times per day for 10 days. (*Id.*). Dr. Myers educated Buchanan that the Maxitrol drops were different from the Debrox drops previously prescribed. (Doc. 133-2 at p. 6). While Debrox is for earwax, Maxitrol addresses mild ear infections by combining two antibiotics with the anti-inflammatory effects of a corticosteroid. (Doc. 110-1 at ¶ 17).

Buchanan returned to nurse sick call on February 1, 2022, where he complained that his ear pain was 10 out of 10, the antibiotics were not working, and he had both drainage and hearing loss. (Doc. 133-2 at 9). The nurse charted Buchanan's affected ear

as his right ear, but Buchanan attested that he has never complained of issues in his right ear, only his left ear. (Doc. 133-1 at ¶ 10). Buchanan reported that he had put water and his fingers in his ear. (Doc. 133-2 at p. 9). At that point, Buchanan's antibiotics had only been prescribed four days prior. (*Id.*).

The next day, Buchanan wrote a grievance complaining about his left ear and the treatment he had received so far. (*Id.* at pp. 10-11). As relief, he requested to be sent to an outside specialist to have his ear looked at or flushed to remove anything inside of it. (*Id.* at p. 10).

Buchanan next wrote a sick call slip on February 10, 2022. (*Id.* at p. 12). He stated that he was still having pain in his left ear despite the medications and ear drops he had been prescribed. (*Id.*). Buchanan also thought there was something in his ear and stated that it was messing with his sleep and mental state. (*Id.*). He wrote another sick call slip on February 11, 2022, because he was in the mental health group when the nurse came for sick call. (*Id.* at p. 13).

A nurse saw Buchanan at sick call on February 12, 2022. (*Id.* at p. 14). The nurse charted Buchanan's complaints as being with his right ear, which Buchanan again disputes. (*Id.*). Buchanan reported that his pain level was 8 out of 10 and that he had hearing loss. (*Id.*). Upon objective physical examination, Buchanan's tympanic membranes, ear cavities, and oral cavities were within normal limits. (*Id.*). He failed a finger rub hearing test in his left ear, and the nurse referred Buchanan to the doctor. (*Id.*).

On February 15, 2022, Buchanan wrote a sick call slip to complain again about pain in his left ear and a feeling like there was something in it. (*Id.* at p. 15). He was seen by a

nurse on February 16, 2022, and described his left ear pain as stabbing and constant. (*Id.* at p. 16). He also reported a feeling of a foreign object in his ear. (*Id.*). He denied sticking any objects in his ear. (*Id.*).

Dr. Myers examined Buchanan two days later, on February 18, 2022. (*Id.* at p. 17). Dr. Myers noted that Buchanan was previously given ear drops to use for seven days, but he continued to have ear pain. (*Id.*). Dr. Myers observed through physical examination that Buchanan had otitis. (*Id.*). Dr. Myers further charted that when Buchanan was seen on January 28, he was argumentative about the drops; therefore, it was questionable whether Buchanan actually used the drops. (*Id.*). Dr. Myers thus prescribed Augmentin, an oral antibiotic, twice per day for seven days, and ordered nursing staff to watch Buchanan take the medication. (*Id.*; Doc. 110-1 at ¶ 23).

Dr. Myers did not see Buchanan again after February 18, 2022. (Doc. 110-1 at ¶ 27). Dr. Myers opined that, given Buchanan's subjective complaints and Dr. Myers's objective findings during this short period of time, there was no clinical need or medical necessity to refer Buchanan to an ENT or audiologist for consultation or testing. (*Id.* at ¶ 33).

Between January 21, 2022, and March 10, 2022, Buchanan made at least 16 complaints regarding his ear pain through sick call notes, grievances, and in his physical examinations. (*See* Doc. 139-2). On March 10, 2022, Buchanan was transferred from Pinckneyville to Menard. (Doc. 104-8 at p. 11).

Buchanan first saw a nurse for his left ear at Menard on March 31, 2022. (*Id.* at p. 12). Buchanan reported a pain level of 8 out of 10 in his left ear, as well as hearing loss, but he denied he had any drainage. (*Id.*). The nurse noted a history of antibiotics and pain

medication ongoing for the past two months. (*Id.*). She could not visualize the tympanic membranes, but she did not see any redness. (*Id.*). The nurse referred Buchanan to a doctor and advised Buchanan not to put anything in his ear. (*Id.*).

Buchanan was scheduled to see NP Crane on Friday, April 1, 2022, for evaluation of his "ear pain x 2 months." (*Id.* at p. 13). NP Crane is a licensed nurse practitioner in the State of Illinois and was employed as a full-time NP at Menard until November 1, 2024. (Doc. 106-4 at ¶ 1). Buchanan failed to appear for his appointment because he "went to [the] yard." (Doc. 104-8 at p. 13). Buchanan testified that he could not recall this specific appointment, but he explained that Tuesdays and Fridays are the only days they can access the phones and make legal calls or reach their families. (Doc. 104-7 at pp. 72-73).

On April 6, 2022, Buchanan was seen in nurse sick call at Menard. (Doc. 104-8 at p. 14). The nurse flushed Buchanan's left ear and a "small dark blockage" was removed from his ear canal. (*Id.*). Upon completion, the ear canal was clear. (*Id.*). Buchanan testified that he saw the blockage after it was removed and he knew it was a roach or spider because it had legs on it. (Doc. 104-7 at p. 75). After his ear was flushed, Buchanan could feel there was nothing in his ear, but he still had ear pain. (*Id.* at p. 76).

Buchanan returned to nurse sick call on April 18, 2022, for complaints of left ear pain at a level 4 out of 10. (Doc. 104-8 at p. 15). Buchanan also reported drainage and hearing loss, and he told the nurse he flushed his ear using water and a cable cord. (*Id.*). The nurse recorded that Buchanan's temperature was normal and his ear, nose, and throat were open with no redness, drainage, or swelling. (*Id.*). Additionally, his bilateral tympanic membranes were intact with no redness, and his external ears and oral cavity

were open and clear with no redness or swelling and no perforations visualized. (*Id.*). However, he failed a finger rub hearing test in his left ear. (*Id.*). Buchanan was referred to a provider and educated not to put anything in his ear. (*Id.*). Buchanan explained at his deposition that he attached a hollow cable cord to his sink and ran hot water by his ear—not directly in his ear—to help soothe his pain. (Doc. 104-7 at p. 78).

On April 20, 2022, Buchanan saw NP Crane for the first time. (Doc. 104-8 at p. 16). Buchanan reported that his ear still hurt at a level 6 out of 10, and he had taken antibiotics "a while back" but they did not work. (*Id.*). NP Crane examined Buchanan's ears and noted that the left and right tympanic membranes were both visualized and within normal limits. (*Id.*). She also charted that Buchanan "may have slight bulge" but he had a clear canal without erythema (redness). (*Id.*). She could not find a physiological reason for his ear pain. (*Id.*). NP Crane ordered an on-site hearing test, 500 mg of Tylenol to be taken twice per day as needed for one month, Debrox ear drops twice per day for five days, and Claritin 10 mg to be taken orally every day for one year. (*Id.*). NP Crane attested that inflammation and allergy symptoms can lead to feelings of ear pain, so she prescribed Claritin and Tylenol to address his complaints. (Doc. 110-5 at ¶ 35). NP Crane also attested that she always instructs patients to refrain from sticking or putting anything in their ears except for prescribed medication. (*Id.* at ¶ 17).

The on-site hearing test was performed on May 4, 2022. (Doc. 104-8 at pp. 17-19). Buchanan failed the hearing test and was referred to a provider to request an audiogram. (*Id.*). On May 9, 2022, NP Dearmond submitted the referral for Buchanan to see a licensed audiologist for an audiogram and hearing evaluation. (*Id.* at p. 20). NP Dearmond is a

licensed Nurse Practitioner in the State of Illinois and was employed as a full-time NP at Menard Correctional Center until December 4, 2024. (Doc. 107-3 at ¶ 1). NP Dearmond did not see or examine Buchanan on May 9, 2022; she merely submitted the referral. (Doc. 106-4 at ¶ 20-22). The referral was approved by Wexford's Utilization Management on May 16, 2022. (*Id.* at p. 22). NP Dearmond attested that the actual scheduling of the audiologist was outside of her control. (*Id.* at ¶ 39). Instead, the time that an inmate is seen by the specialist is controlled solely by the specialist. (*Id.*).

On June 17, 2022, NP Crane resubmitted the referral for Buchanan to see a licensed audiologist for a hearing evaluation and audiogram. (Doc. 110-5 at p. 25). NP Crane attested that she noticed the approved referral had not been scheduled, so she resubmitted the referral in an attempt to expedite the hearing evaluation and audiogram. (Doc. 110-5 at ¶ 36). Utilization Management again authorized the referral on June 27, 2022. (*Id.* at pp. 27-28).

Buchanan returned to nurse sick call on September 26, 2022, complaining of left ear pain. (Doc. 104-8 at p. 26). Buchanan said his pain was at 7-8 out of 10, and he reported hearing loss. (*Id.*). He also stated that he put warm water in his ear. (*Id.*). The nurse noted swelling and redness and another failed finger rub hearing test. (*Id.*). NP Michael Moldenhauer prescribed Amoxil, an oral antibiotic, and Floxin, an anti-bacterial ear drop. (*Id.* at pp. 26, 40).

On October 28, 2022, Buchanan was seen in nurse sick call for complaints of left ear pain for the past five days. (*Id.* at p. 27). Buchanan reported a greenish brown discharge from his ear, hearing loss, and a pain level of 8 out of 10. (*Id.*). He also reported

using a tube to shoot water into his ear. (*Id.*). The otoscope was not working, so the nurse could not look in Buchanan's ear. (*Id.*). Buchanan failed the finger rub hearing test in his left ear. (*Id.*). He was referred to the doctor for acute pain and prescribed Tylenol, 325 mg three times per day for three days as needed. (*Id.*).

On November 11, 2022, Buchanan saw Dr. Glen Babich via telemedicine. (*Id.* at p. 28). Dr. Babich charted that Buchanan subjectively reported pain and decreased hearing in his left ear, a tympanic membrane bulge, and wax buildup. (*Id.*). Dr. Babich could not visualize Buchanan's tympanic membrane or ear canal due to the telemedicine appointment, but he noted tenderness at the temporomandibular joint (TMJ). (*Id.*). Dr. Babich's assessment at this time was cerumen (earwax) in his ear with or without hearing loss. (*Id.*). He ordered: an on-site dental appointment to assess Buchanan's TMJ; an on-site provider to visualize Buchanan's left ear canal; a follow-up and audiology exam and audiogram; Naprosyn 500 mg one tablet by mouth twice daily as needed for six months; and cetirizine (antihistamine) 10 mg one tablet by mouth one time daily for six months. (*Id.* at pp. 28, 41).

On December 21, 2022, Buchanan refused his scheduled audiology exam. (*Id.* at 30). A note by the Assistant ADA Coordinator states that Buchanan was not brought to his onsite audiology appointment because Buchanan "refused" the appointment. (*Id.* at p. 31). Buchanan testified that he had a legal call that day and did not know that the appointment was with an audiologist. (Doc. 104-7 at p. 101). Had he known it was for a hearing evaluation, he would not have refused the appointment. (*Id.* at p. 102).

Audiologist Dr. David Taylor examined Buchanan at a rescheduled appointment

on January 26, 2023. (Doc. 104-8 at pp. 44-45). Dr. Taylor noted that an otoscopy revealed clear, unremarkable ear canals and tympanic membranes bilaterally. (*Id.*). Dr. Taylor observed: "Audiometric testing revealed functional hearing loss. PTA and SRT were in poor agreement, indicating poor test reliability. Note unmasked AC thresholds; crossover not present where it would be expected, suggesting a malingering component." (*Id.* at p. 44). Dr. Taylor recommended retesting within six months to one year later. (*Id.* at p. 43).

NP Crane last examined Buchanan on March 14, 2023. (*Id.* at p. 34). She noted that Buchanan reported his ear problem had been going on for 14 or 15 months and was not getting any better. (*Id.*). NP Crane charted that Buchanan's right ear tympanic membrane and canal were normal. (*Id.*). His left ear tympanic membrane was creamy in color but there was no drainage noted, and his left ear canal had erythema. (*Id.*). NP Crane assessed Buchanan as having otitis media—an ear infection—in his left ear and prescribed Augmentin, Ciprodex drops, and Tylenol. (*Id.*).

NP Crane opined, based on her education and experience treating similarly situated patients and her training as a licensed nurse practitioner, that Buchanan's complaints on April 20, 2022, October 28, 2022, and November 11, 2022, were due to transient otitis media with effusion. (Doc. 110-5 at ¶ 41). She further opined that transient otitis media with effusion is treated with observation and re-examination every six months. (*Id.*). Based on Buchanan's subjective complaints and her objective findings during her two examinations, NP Crane attested that there was no clinical need or medical necessity to refer Buchanan to an ENT. (*Id.* at ¶ 42).

NP Dearmond saw Buchanan on August 17, 2023. (Doc. 104-8 at p. 50). Buchanan

told NP Dearmond he had experienced "constant" left ear pain for the past year and a half. (*Id.*). He also told NP Dearmond he had a roach in his ear at Pinckneyville, decreased hearing in his left ear but not deafness, and yellow green drainage from his ear two to three weeks ago. (*Id.*). NP Dearmond examined Buchanan's ears and noted that his tympanic membranes were both pearly white, his right tympanic membrane had a slight bulge, neither ear had earwax, active drainage, or redness, and both inner ears were very clean. (*Id.*). She discussed the audiology test from January 26, 2023, which was unremarkable, and she noted that the audiologist recommended repeating the hearing test at a later date. (*Id.*). She also observed that Buchanan was able to understand and hear her without difficulty, and that he left the office in good spirits. (*Id.*). NP Dearmond explained to Buchanan that sometimes a slight bulge in the tympanic membrane can be from seasonal allergies and can cause slight pain, but overall his ears looked good. (*Id.*). She prescribed Zyrtec, Nasacort allergy spray, and ibuprofen. (*Id.*). This was the only time that NP Dearmond saw Buchanan for an appointment relating to his left ear. (*Id.*).

No further audiology testing has been completed despite Dr. Taylor's recommendation that one be completed between six months and one year from January 26, 2023. (Doc. 139-1 at ¶ 20).

B.   Defendant Bowman

At all times relevant to this case, Bowman was the Agency Medical Director of the IDOC. (Doc. 104-7 at p. 21). Buchanan was never seen or treated by Bowman, nor did Buchanan ever communicate with Bowman. (*Id.*). Buchanan testified that he sued Bowman because "he's over the IDOC" as the Agency Medical Director. (*Id.*).

As Agency Medical Director, Bowman attested, he provides administrative oversight of the medical operations of the IDOC. (Doc. 118-1). He does not provide direct medical care to any individual in custody. (*Id.*). Bowman also is not responsible for staffing decisions for the licensed medical providers who provide care at IDOC facilities. (*Id.*). Those responsibilities, including decisions regarding the hiring of facility medical directors, medical doctors, nurse practitioners, or physician assistants, belong solely with Wexford Health Sources, Inc.[1] (*Id.*).

## LEGAL STANDARD

Summary judgment is appropriate where there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). In determining whether a genuine issue of fact exists, the Court views the evidence and draws all reasonable inferences in favor of the non-moving party. *Ziccarelli v. Dart*, 35 F.4th 1079, 1083 (7th Cir. 2022). Once the moving party sets forth the basis for summary judgment, the burden shifts to the nonmoving party who must go beyond mere allegations and offer specific facts showing that there is a genuine issue of fact for trial. FED. R. CIV. P. 56(e); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). A moving party is entitled to judgment as a matter of law where the non-moving party "has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex*, 477 U.S. at 323.

---

[1] Buchanan objects to this statement of fact because he believes Bowman would be providing medical direction to Wexford as to the staffing, or lack thereof, at each facility. However, Buchanan has not pointed to any specific evidence in the record to support his objection. FED. R. CIV. P. 56(c)(1). Therefore, the objection is overruled.

## DISCUSSION

### I.      Deliberate Indifference

"The Eighth Amendment proscribes 'deliberate indifference to serious medical needs of prisoners' amounting to 'the unnecessary and wanton infliction of pain.'" *Arce v. Wexford Health Sources Inc.*, 75 F.4th 673, 678–79 (7th Cir. 2023) (quoting *Stockton v. Milwaukee County*, 44 F.4th 605, 614 (7th Cir. 2022)). "Deliberate indifference requires '[s]omething more than negligence or even malpractice.'" *Id.* at 679 (quoting *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014)). To succeed on an Eighth Amendment deliberate indifference claim, a plaintiff must show: (1) he suffered from an objectively serious medical condition; and (2) the individual defendant was deliberately, that is subjectively, indifferent to that condition. *Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019).

A medical condition is objectively serious if "a physician has diagnosed it as requiring treatment, or the need for treatment would be obvious to a layperson." *Lockett v. Bonson*, 937 F.3d 1016, 1023 (7th Cir. 2019) (citation omitted). It is not necessary for a condition to "be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010); *accord Farmer v. Brennan*, 511 U.S. 825, 828 (1994) (violating the Eighth Amendment requires "deliberate indifference to a *substantial* risk of *serious* harm") (internal quotation marks omitted) (emphasis added).

Prevailing on the subjective prong requires a plaintiff to show that a prison official has subjective knowledge of—and then disregards—an excessive risk to inmate health. *Id.* at 653. "When a prison medical professional is accused of providing inadequate

Page 16 of 27

treatment (in contrast to no treatment), evaluating the subjective state-of-mind element can be difficult." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016). The plaintiff need not show the individual "literally ignored" his complaint, but that the individual knew of the condition and either knowingly or recklessly disregarded it. *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008).

"Something more than negligence or even malpractice is required" to prove deliberate indifference. *Pyles v. Fahim*, 771 F.3d 403, at 409 (7th Cir. 2014). The defendant must have had "actual, personal knowledge of a serious risk, coupled with the lack of any reasonable response to it." *Ayoubi v. Dart*, 724 F. App'x 470, 474 (7th Cir. 2018). Proving deliberate indifference "is a high bar 'because it requires a showing [of] something approaching a total unconcern for the prisoner's welfare in the face of serious risks.'" *Rasho v. Jeffreys*, 22 F.4th 703, 710 (7th Cir. 2022) (quoting *Rosario v. Brawn*, 670 F.3d 816, 821 (7th Cir. 2012)). "By definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016).

Most cases of deliberate indifference turn on circumstantial evidence. *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016), *as amended* (Aug. 25, 2016); *see also Brown v. Osmundson*, 38 F.4th 545, 550 (7th Cir. 2022). "Several circumstances can permit a jury to reasonably infer deliberate indifference, such as denial of medical treatment altogether, *id.* at 729, delay of medical care, *Dobbey v. Mitchell-Lawshea*, 806 F.3d 938, 940 (7th Cir. 2015), continued ineffective treatment, *Conley v. Birch*, 796 F.3d 742, 747 (7th Cir. 2015),

Page 17 of 27

'a substantial departure from accepted professional judgment, practice, or standards,' *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261–62 (7th Cir. 1996), ignoring an obvious risk, *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006), and refusing care because of cost, *Ralston v. McGovern*, 167 F.3d 1160, 1162 (7th Cir. 1999)." *Brown*, 38 F.4th at 550.

## II.    Objectively Serious Medical Need

The Wexford Defendants first assert they are entitled to summary judgment because there is no evidence that Buchanan suffered from an objectively serious medical condition.[2] While they acknowledge that an ear infection can be deemed "objectively serious where it inflicts prolonged suffering and requires extensive treatment," they contend that pain and/or hearing problems attributed to earwax buildup or irrigation treatment do not rise to the level of an objectively serious medical need. The Wexford Defendants each assert:

> Buchanan's condition, a suspected ear infection, did not inflict prolonged suffering or require extensive treatment. [Buchanan's] left ear condition was not chronic and did not cause him substantial pain and did not significantly affect (or affect at all) his daily activities. [Buchanan] was never at a serious risk of harm for his sporadic, transitory, and benign left ear complaints.

(Doc. 103 at p. 20, Doc. 106 at p. 18, Doc. 109 at p. 18).

The Court respectfully disagrees and finds that Buchanan's ear pain and hearing loss constituted an objectively serious medical condition. During his time at Pinckneyville, Buchanan complained at least 16 times about his ear pain and the feeling that something was in his ear. Once he was transferred to Menard, Buchanan continued

---

[2] For the purposes of summary judgment only, Defendant Bowman does not dispute that Buchanan had an objectively serious medical condition. (Doc. 118 at p. 7).

to complain of ear pain and hearing loss, resulting in a referral to an audiologist. The audiologist's testing then revealed functional hearing loss. While Dr. Taylor suspected malingering, he also recommended retesting in six months to a year.

Defendants point to Buchanan's refusal to see the audiologist on December 21, 2022, as evidence that his complaints were not serious. But, Buchanan testified that he had a legal call and did not realize the appointment was with an audiologist. They also refer to the "dozens of appointments" after Buchanan's final appointment with NP Crane where he did not report any left ear pain or discomfort. Setting aside the fact that those dates fall outside the relevant time period, the Court notes that those records relate to a left shoulder injury and subsequent physical therapy; no notes regarding ear pain would be expected to be found in those records. To be sure, the records provided to the Court show that Buchanan continued to complain about left ear pain as late as October 12, 2024. (Doc. 104-8 at p. 74).

The record also refutes Defendants' claims that Buchanan's condition "did not inflict prolonged suffering," "was not chronic," and "did not cause him substantial pain." During the relevant time frame, Buchanan consistently reported severe ear pain that, on at least one occasion, he described as stabbing. It affected his sleep and his mental state. Only once did he rate his left ear pain lower than 6 on a scale of 1 to 10. Buchanan's description of his pain is subjective, but "there is no requirement that a prisoner provide 'objective' evidence of his pain and suffering—self-reporting is often the only indicator a doctor has of a patient's condition." *Klein v. Wexford Health Sources, Inc.*, No. 16 C 8818, 2019 WL 2435850, at *9 (N.D. Ill. June 11, 2019) (quoting *Greeno v. Daley*, 414 F.3d 645, 655

(7th Cir. 2005)).

Viewing the evidence and all reasonable inferences in a light most favorable to Buchanan, a jury could find that Buchanan's ear pain and hearing loss was an objectively serious medical condition.

## III.    Subjective Indifference to Buchanan's Medical Condition

The Wexford Defendants also argue that, even if Buchanan's ear pain and hearing loss constituted an objectively serious medical condition, there is no evidence that they knowingly or recklessly disregarded it.

### A.    Dr. Myers

As to Dr. Myers, Buchanan claims that Dr. Myers failed to properly treat his ear pain, persisted in a course of treatment that was ineffective, and allowed him to be transferred to Menard without treatment.

Dr. Myers first saw Buchanan on January 28, 2022, where he took Buchanan's history and used an otoscope to examine Buchanan's left ear. Dr. Myers diagnosed Buchanan with mild otitis and prescribed Maxitrol, a broad spectrum antibiotic that is "highly effective" in addressing mild ear infections. (Doc. 110-1 at ¶ 17). He further educated Buchanan about Maxitrol and how it is different from Debrox, an over-the-counter medication used to remove earwax. (*Id.* at ¶ 18). When Dr. Myers saw Buchanan less than a month later on February 18, 2022, he again performed a full examination, diagnosed otitis, and prescribed an oral antibiotic to treat a suspected ear infection. Dr. Myers prescribed the oral antibiotic, which was to be taken in the presence of the nursing staff, because, at his first visit, Buchanan had argued that the Maxitrol drops

would be useless. (*Id.* at ¶¶ 18, 23). Thus, Dr. Myers wanted to ensure compliance with the antibiotic regimen. Dr. Myers attested that this would allow him to treat any possible infection of the inner ear and also monitor Buchanan's adherence to the treatment plan. (*Id.* at ¶ 23).

It is clear that Dr. Myers used his professional judgment in diagnosing and treating Buchanan for a suspected ear infection. Nothing about his treatment decision is "so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Johnson v. Dominguez*, 5 F.4th 818, 825 (7th Cir. 2021). While Buchanan argues that Dr. Myers delayed his access to proper medical care by denying his request for an ear flush, "[a] medical professional is entitled to deference in treatment decisions unless 'no minimally competent professional would have so responded under those circumstances.'" *Sain v. Wood*, 512 F.3d 886, 894–95 (7th Cir. 2008) (quoting *Collingnon v. Milwaukee Cnty.*, 163 F.3d 982, 988 (7th Cir. 1998)).

Buchanan also asserts that Dr. Myers persisted in a course of treatment that he knew to be ineffective because he continued to prescribe an oral antibiotic after Buchanan told him the Maxitrol did not work. Even if Dr. Myers was incorrect in his suspicion that Buchanan was not using the Maxitrol as directed, his decision to prescribe Augmentin was not deliberate indifference. Augmentin is a different antibiotic that is taken orally rather than in drop form, and thus could have a different result. Dr. Myers also attested that a treatment plan consisting of Maxitrol and Augmentin is consistent with the community standard of care for treating suspected infections with middle ear effusion. (Doc. 110-1 at ¶ 31). Moreover, he attested, there was no clinical or medical necessity to

refer Buchanan to an ENT or audiologist at that time. (*Id.* at ¶ 33).

With regard to Buchanan's claim that Dr. Myers allowed him to be transferred to Menard without receiving treatment, Dr. Myers attested that he has no role or authority in deciding when, where, or how inmates are transferred within the IDOC. (*Id.* at ¶ 50). Dr. Myers, a Wexford employee, also cannot prevent an inmate from transferring facilities because only the IDOC has authority over the placement of IDOC inmates. (*Id.*). Buchanan further testified that he does not know whether Dr. Myers had any authority or final say over inmate transfers. (Doc. 104-7 at p. 64). Thus, no reasonable jury would find that Dr. Myers was deliberately indifferent in allowing Buchanan to be transferred to Menard.

For these reasons, Dr. Myers is entitled to summary judgment.

B.    NP Crane and NP Dearmond

Buchanan next claims that NP Crane and NP Dearmond were deliberately indifferent when they refused to submit an urgent referral to an outside specialist for his left ear condition, even though they knew of his left ear pain and hearing loss, and even though Menard did not have an on-site doctor at that time.

Based on the summary judgment record, no reasonable juror would find NP Crane or NP Dearmond deliberately indifferent for failing to mark his referral to the audiologist as "urgent." NP Crane examined Buchanan's left ear and found no physiological reason for his ear pain. His tympanic membrane was within normal limits, his ear canal was clear, and there was no redness. Based on her medical judgment and training as a nurse practitioner, NP Crane diagnosed Buchanan with unspecified ear pain and prescribed

Debrox, Claritin, and Tylenol. Although Buchanan did not complain about hearing loss to NP Crane, based on his complaints to other medical providers, she referred him for an on-site hearing test, which occurred on May 4, 2022.

After Buchanan failed the on-site hearing test, he argues, he should have been referred for an Audiological Evaluation within 30 days pursuant to the *Holmes* settlement agreement. *See Holmes v. Baldwin*, No. 11-cv-2961 (N.D. Ill. Apr. 23, 2018), Doc. 426-2. He asserts Defendant Crane harmed him by delaying his referral to an audiologist by 44 days beyond the failed hearing test.

This argument is unpersuasive considering NP Dearmond referred Buchanan to the audiologist "per *Holmes* Settlement Agreement" on May 9, 2022, just five days after his failed on-site hearing test. (Doc. 104-8 at p. 20). The Medical Furlough Clerk received the referral on May 11, 2022, and sent it to Utilization Management for approval. (*Id.* at p. 21). On May 16, 2022, the Medical Furlough Clerk received the authorization, and Buchanan was referred to a licensed audiologist the next day. (*Id.* at p. 22). NP Crane attested that she noticed the approved referral had not been scheduled, so she *resubmitted* the referral on June 17, 2022, in an attempt to expedite an audiogram and hearing evaluation. (Doc. 110-5 at ¶ 36). Thus, not only was Buchanan referred to an audiologist for evaluation within 30 days of his failed onsite hearing test, but NP Crane followed up and re-referred Buchanan so that his referral would not slip through the cracks. No reasonable jury would consider this deliberate indifference.

NP Crane and NP Dearmond also attested that once they referred Buchanan to the audiologist, the scheduling of that appointment was out of their control. (Doc. 110-5 at

¶ 37; Doc. 107-3 at ¶ 39). The specialists manage their own schedules, and neither NP Crane nor NP Dearmond are responsible for the time between the referral approval and the inmate's appointment with a specialist. (*Id.*). Buchanan has not presented any evidence to the contrary.

Buchanan additionally argues that when NP Crane first saw Buchanan on April 20, 2022, she prescribed Debrox, Claritin, and Tylenol, citing a normal physical examination and absence of objective findings. The next time NP Crane saw Buchanan, on March 14, 2023, she continued the same course of treatment even though she should have been aware of both the failed onsite hearing test from May 4, 2022, and the audiologist's report of January 26, 2023. Buchanan argues that NP Crane's use of the same treatments despite his continuing pain and hearing loss constitutes deliberate indifference. Similarly, Buchanan argues that NP Dearmond did not take any action or initiate a referral when she saw him on August 17, 2023, despite knowing of his ear pain since January 2022.

These claims are unexhausted. Buchanan filed his Complaint on February 16, 2023, before NP Crane saw Buchanan a second time and before NP Dearmond examined Buchanan at all. And, the Complaint only references these Defendants' failure to submit an urgent referral for Buchanan to see a specialist for his left ear pain and hearing loss. Any other claims of deliberate indifference have not been exhausted and, thus, will not be considered. *See Jones v. Bock*, 549 U.S. 199, 202 (2007) ("[T]he PLRA . . . requires prisoners to exhaust prison grievance procedures before filing suit.").

## IV.    Defendants Bowman and Wills

Buchanan is proceeding on one claim of deliberate indifference against Bowman, the IDOC's Agency Medical Director, in his individual capacity, for failing to hire an on-site medical doctor at Menard. Buchanan contends that the lack of an on-site doctor prevented him from receiving care for his left ear issues. Warden Wills was added as a Defendant, in his official capacity only, for the sole purpose of implementing any future injunctive relief that may be granted.

Bowman moves for summary judgment on the basis that he, as the Agency Medical Director, is not a treating medical provider for the IDOC, nor is he authorized to make hiring decisions regarding the licensed medical providers at IDOC facilities. As a result, he lacked sufficient personal involvement in the alleged constitutional violation and cannot be held liable under § 1983. Alternatively, he asserts he is protected by the doctrine of qualified immunity. Defendants also argue that because Buchanan cannot establish that he is entitled to any injunctive relief, the official capacity claim against Wills should also be dismissed.

In response, Buchanan argues that Bowman was personally involved because he knew not having an on-site doctor would hinder inmates' access to medical care, and he was aware of the issues plaguing IDOC facilities regarding treatment of hearing issues because of the *Holmes* settlement. Buchanan asserts that, due to the lack of a prison doctor, he only received care at sick call, he "received basic medication because nurses were not authorized to diagnose medical conditions or write prescriptions," and the staff repeatedly continued the same ineffective treatment.

Section 1983 liability must be premised on personal liability; the individual must have caused or participated in the constitutional deprivation. *Rasche v. Vill. of Beecher*, 336 F.3d 588, 597 (7th Cir. 2003). Here, however, Buchanan has not provided any evidence that Bowman personally knew of Buchanan's complaints and turned a blind eye to them. Buchanan testified that he sued Bowman because "he's over the IDOC" as the Agency Medical Director, but Bowman attested that he only provides administrative oversight over the medical operations, and he does not have the authority to hire licensed medical providers — including doctors who provide treatment at IDOC facilities. At the time, that was the responsibility of Wexford Health Sources, Inc. Buchanan has not refuted this evidence. Moreover, Bowman cannot be held responsible for the acts and/or omissions of any other IDOC employees because there is no respondent superior or "supervisor liability" under 42 U.S.C. § 1983. *See Chavez v. Illinois State Police*, 251 F.3d 612, 651 (2001).

Furthermore, Buchanan's complaints regarding a lack of treatment is not supported by the record. Buchanan was examined by multiple licensed nurse practitioners, including NP Crane and NP Dearmond, who are fully qualified to make diagnoses, treat, make referrals, and write prescriptions. He also had a telehealth appointment with Dr. Glen Babich. While Buchanan claims that he was only prescribed "minimal pain medication," there is no evidence that a stronger pain medicine or a longer pain medicine regimen was indicated for his condition. In sum, there is no evidence that Buchanan's access to medical care would have been different if a medical doctor had been on-site at Menard.

Finally, while Buchanan claims that Bowman knew about problems within the

IDOC and its treatment of hearing issues because of the *Holmes* settlement agreement, his statement is based on pure speculation. Even if the *Holmes* case had any relevance here, Buchanan fails to connect the dots and explain how Bowman's knowledge of the *Holmes* settlement agreement makes him liable for deliberate indifference in *this* case.

Because no reasonable jury would find that Bowman had the requisite personal involvement in Buchanan's alleged constitutional deprivations, Bowman is entitled to summary judgment. Additionally, because Buchanan is not entitled to any injunctive relief, Warden Anthony Wills shall be dismissed.

### CONCLUSION

For these reasons, the Motions for Summary Judgment filed by Defendants Jilian Crane, NP (Doc. 102), Alisa Dearmond, NP (Doc. 105), and Percy Myers, M.D. (Doc. 108) are **GRANTED**.

The Motion for Summary Judgment filed by Steven Bowman and Anthony Wills (Doc. 117) is also **GRANTED**.

Plaintiff Meiko Buchanan shall recover nothing. The Clerk of Court is **DIRECTED** to enter judgment accordingly and close this case.

**IT IS SO ORDERED.**

**DATED:    March 16, 2026**

**NANCY J. ROSENSTENGEL**
**United States District Judge**

Page 27 of 27